Slip Op. 12-150

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                                    :
HUSQVARNA CONSTRUCTION                 :
PRODUCTS NORTH AMERICA and             :
HUSQVARNA (HEBEI) CO., LTD.                :
(f/k/a HEBEI HUSQVARNA-JIKAI              :
DIAMOND TOOLS CO., LTD.),                   :
                                                    :                    Before: Richard K. Eaton, Judge
              Plaintiffs,                    :
                                                    :                    Court No. 12-00205
                          v.                 :
                                                    :
UNITED STATES,                                :
                                                    :
              Defendant.                   :
_____  :

OPINION AND ORDER

[Plaintiffs' petition for a writ of mandamus is denied.]

Dated: December 6, 2012

        *Cassidy Levy Kent (USA) LLP* (*John D. Greenwald*, *Robert C. Cassidy Jr.*, and *Thomas M. Beline*), for plaintiffs.

        *Stuart F. Delery*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Nathaniel Halvorson*), of counsel, for defendant.

        Eaton, Judge:  Before the court is plaintiffs' Petition for a Writ of Mandamus (ECF Dkt.

No. 8) ("Pls.' Pet."). By their petition, plaintiffs, Husqvarna Construction Products North

America and Husqvarna (Hebei) Company, Ltd. (formerly known as Hebei Husqvarna-Jikai

Diamond Tools Co., Ltd.) (collectively, "plaintiffs"), seek to compel the United States

Department of Commerce ("Commerce" or "the Department") to set a "provisional cash deposit

rate" for Husqvarna (Hebei) Company, Ltd. ("Hebei Husqvarna") and issue corresponding cash

deposit instructions to U.S. Customs and Border Protection ("Customs").[1]  Jurisdiction is

founded on 28 U.S.C. §§ 1581(i)(2) and (4) (2006).  The court heard oral argument on the

Petition on November 28, 2012 (ECF Dkt. No. 28).

Hebei Husqvarna is a separate rate respondent in the first administrative review of

imports under the antidumping order on diamond sawblades and parts thereof from the People's

Republic of China ("PRC") during the period of review ("POR") January 23, 2009 through

October 31, 2010.  On December 6, 2011, Commerce published its Preliminary Results, in which

it assigned an 8.5% ad valorem antidumping duty margin to the separate rate respondents,

including Hebei Husqvarna.  *See* Diamond Sawblades and Parts Thereof From the PRC, 76 Fed.

Reg. 76,135 (Dep't of Commerce Dec. 6, 2011) (preliminary results of antidumping duty

administrative review and intent to rescind review in part).

Pursuant to 19 U.S.C. § 1675(a)(3)(A) (2006), Commerce "shall make" a final

determination in an administrative review within 180 days[2] after the publication of the

preliminary results of the review, which, in this case, would have been June 4, 2012.  Thus,

Hebei Husqvarna insists that Commerce was required to make its final determination and set a

cash deposit rate for the company by June 4, 2012.  Commerce, however, did not issue the final

---

[1]        Plaintiffs' Petition also asks the court to direct Commerce to rescind the
administrative review for Hebei Jikai Industrial Group Co., Ltd. ("Industrial") because the
review request filed by the domestic industries was withdrawn.  Pursuant to the court's oral
request during a status teleconference on August 8, 2012, defendant submitted a copy of
Diamond Sawblades and Parts Thereof From the People's Republic of China, 77 Fed. Reg.
47,362 (Dep't of Commerce Aug. 8, 2012) (rescission of antidumping duty administrative
review in part), which demonstrated that the administrative review had been rescinded as to
Industrial.  Therefore, plaintiffs' second request for relief is moot and only the first request, i.e.,
the issuance of a provisional cash deposit rate for Hebei Husqvarna, remains.

[2]        In particular, the statute directs that Commerce "shall make . . . a final
determination . . . within 120 days after the date on which the preliminary determination is
published.  If it is not practicable to complete the review within the foregoing time, [Commerce]
. . . may extend that 120-day period to 180 days."  19 U.S.C. § 1675(a)(3)(A).

results by that date, nor has it yet issued them.  According to plaintiffs, Commerce's reasons for

not meeting the statutory deadline involve circumstances unrelated to Hebei Husqvarna, and, as a

consequence of Commerce's failure to act, the company is required to post cash deposits on its

entries at the PRC-wide cash deposit rate of 164.09% ad valorem for an indefinite period.  Thus,

plaintiffs seek a writ of mandamus to compel Commerce to set a provisional, and necessarily

lower, cash deposit rate pending the issuance of the final results.

For the reasons set forth below, plaintiffs' petition is denied.

## **BACKGROUND**

On November 4, 2009, Commerce issued antidumping duty orders covering diamond

sawblades from the PRC and the Republic of Korea.  Diamond Sawblades and Parts Thereof

From the PRC and the Republic of Korea, 74 Fed. Reg. 57,145 (Dep't of Commerce Nov. 4,

2009) (antidumping duty orders) ("PRC Order" and "Korea Order," respectively).  Under the

PRC Order, Commerce established three types of cash deposit rates: (1) the individually-

examined respondents' rates; (2) the PRC-wide rate; and (3) a "separate rate," assigned to

companies that were not individually examined, but could demonstrate their independence from

government control.[3]

---

[3]      Because the PRC is designated a non-market economy, there is a rebuttable
presumption that all PRC companies are subject to government control and should be assigned a
single antidumping duty margin—the PRC-wide rate.  Thus, to establish a separate rate,
Commerce requires PRC companies to provide evidence establishing that they are sufficiently
independent from the government.  *See Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d
1369, 1372 (Fed. Cir. 2003) ("[T]he Department [has] adopted . . . a presumption that the PRC
[i]s a nonmarket economy . . . country pursuant to 19 U.S.C. § 1677(18)(A), requiring companies
desiring an individualized antidumping duty margin to so request and to demonstrate an absence
of state control."); *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 35
CIT __, __, Slip Op. 11-00123 at 35 (Oct. 12, 2011) (not reported in the Federal Supplement)
("A producer may rebut this presumption by 'affirmatively demonstrat[ing] its entitlement to a
separate, company-specific margin.'" (quoting *Sigma Corp. v. United States*, 117 F.3d 1401,

Under the final results of the underlying antidumping investigation for the PRC, the

companies that received a separate rate in the underlying investigation were assigned a cash

deposit rate of 21.43% ad valorem, which is the weighted average of the three mandatory

respondents' calculated margins from the investigation.  *See* Diamond Sawblades and Parts

Thereof from the PRC, 71 Fed. Reg. 29,303 (Dep't of Commerce May 22, 2006) (final

determination of sales at less than fair value and final partial affirmative determination of critical

circumstances).  Hebei Husqvarna, however, is a new entity that was not in existence during the

underlying antidumping investigation that was conducted in 2005 and 2006.  Therefore, Hebei

Husqvarna is not entitled to the "separate rate," and its entries of sawblades are subject to the

PRC-wide antidumping rate of 164.09% ad valorem until the issuance of updated rates upon

completion of the first administrative review.[4]

On November 30, 2010, the domestic industries asked Commerce to conduct an

administrative review of forty-seven PRC producers and exporters of diamond sawblades and

---

1405 (Fed. Cir. 1997))).

[4]        "[T]he United States uses a 'retrospective' assessment system under which final
liability for antidumping . . . duties is determined after merchandise is imported."  19 C.F.R. §
351.212(a).  While an importer deposits estimated duties upon the entry of merchandise, the
actual duties are determined later in the assessment process, at the time when the entries are
liquidated.  *See* 19 C.F.R. § 141.103; *Parkdale Int'l v. United States*, 475 F.3d 1375, 1376–77
(Fed. Cir. 2007) ("While liability to pay dumping duties accrues upon entry of subject
merchandise, . . . the actual duty is not estimated antidumping duties at the time of entry, and not paid until
the [entries] are liquidated by [Customs]." (citing 19 C.F.R. § 141.1(a))).  "Generally, the
amount of duties to be assessed is determined in a review of the order covering a discrete period
of time." 19 C.F.R. § 351.212(a).  If no request for a review is made, Commerce instructs
Customs to liquidate the entries at the estimated antidumping duties at the time of entry.  19
C.F.R. § 351.212(c)(i).  If a timely request for review is made, Commerce publishes the notice of
initiation of the review in the *Federal Register* and commences the review, during which time
liquidation is suspended.  19 C.F.R. § 351.212(c)(2); 19 C.F.R. § 351.221(b).  Following the
review, Commerce publishes the final results of the review, and the entries are liquidated in
accordance with those final results, unless there is an appeal to this Court.  19 C.F.R. §
351.221(b).  The final results of the review set the cash deposit rate going forward.  19 C.F.R. §
351.221(b).

parts thereof.[5]  On December 28, 2010, Commerce initiated the first administrative review under

the PRC order, and selected Advanced Technology & Materials Co., Ltd. and its affiliates

(collectively, "ATM") and Weihai Xiangguang Mechanical Industrial Co., Ltd. ("Weihai") for

individual examination.  Seventeen other exporters and producers, including Hebei Husqvarna,

filed applications for separate rates.

On December 6, 2011, Commerce published its Preliminary Results, in which it (1)

calculated a de minimis antidumping duty margin for ATM, (2) calculated an 8.5% ad valorem

antidumping duty margin for Weihai, and (3) assigned an 8.5% ad valorem antidumping duty

margin to the separate rate respondents, including Hebei Husqvarna.  *See* Diamond Sawblades

and Parts Thereof From the PRC, 76 Fed. Reg. 76,135, 76,141–42 (Dep't of Commerce Dec. 6,

2011) (preliminary results of antidumping duty administrative review and intent to rescind

review in part).

Thus, until March 27, 2012, it appeared that Commerce was on schedule to meet the

statutory deadline for issuance of a final determination, and that Hebei Husqvarna would receive

a separate rate in the final determination.  On that date, however, representatives of the domestic

diamond sawblade industry filed a submission with Commerce alleging that the three mandatory

respondents in the separate antidumping duty administrative review of imports of diamond

sawblades from Korea were the subject of a transshipment investigation by the Korean Customs

Service.  The administrative review of Korean diamond sawblades was being conducted in

parallel with the PRC administrative review, covering the same POR and following a similar

timetable for completion.

---

[5]        On March 28, 2011, petitioners withdrew their review request for ten of the forty-
seven companies, including Industrial.

The domestic industry alleged that the Korean respondents exported to Korea diamond sawblades that were produced in China and illegally changed the country of origin labels from China to Korea.  The domestic industry further claimed that the diamond sawblades were then re-exported to the United States.  In response to these allegations, Commerce issued supplemental questionnaires to the three Korean respondents and to two Chinese companies that the Department determined were affiliated with these Korean respondents.  No questionnaires were issued to Hebei Husqvarna, and no allegation was made that Hebei Husqvarna conspired with the Korean respondents or their Chinese affiliates.

On June 4, 2012, the statutory deadline for the issuance of the final results of the first administrative review of the PRC Order, Commerce issued a memorandum announcing that it was "defer[ing] the final results of the first administrative reviews of the antidumping duty orders" because it "has not had sufficient time to adequately develop and analyze evidence regarding the fraud allegations."  Mem. from Gary Taverman, Senior Advisor for Antidumping & Countervailing Duty Operations, to Paul Piquado, Assistant Sec'y for Imp. Admin., A-580-855, A-570-900, at 1, 4 (Dep't of Commerce June 4, 2012) (attached as Compl. Ex. A) ("Deferral Mem.").  The Department explained that the fraud allegations could affect "sales and cost information that is essential to the results of this [PRC] administrative review."  Deferral Mem. 5.  On June 27, 2012, Commerce issued a memorandum to all parties with its anticipated schedule for completing the administrative results, estimating that the final results would issue on December 21, 2012.  In the interim, entries of Hebei Husqvarna sawblades continue to be subject to the PRC-wide cash deposit rate of 164.09%.

## LEGAL FRAMEWORK

Because a writ of mandamus "is one of 'the most potent weapons in the judicial arsenal,'" three conditions must be satisfied before it may issue." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citations omitted). "First, there must be a clear duty on the part of the defendant to perform the act in question." *Mukand Int'l, Ltd. v. U.S.*, 502 F.3d 1366, 1369 (Fed. Cir. 2007). "Second, the petitioner must satisfy the burden of showing that [its] right to issuance of the writ is clear and indisputable," and that it has "no other adequate means to attain the relief [it] desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81 (internal quotation marks and citations omitted). "Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* at 381.

## DISCUSSION

### I.      Commerce Did Not Have a "Clear Duty" to Issue the Final Results Within the Statutorily-Provided Timeframe

Under 19 U.S.C. § 1675(a)(1)(B), "[a]t least once during each 12-month period beginning on the anniversary of the date of publication of . . . an antidumping duty order . . . , if a request for such a review has been received . . . , [Commerce] shall . . . review, and determine . . . , the amount of any antidumping duty." The Department is then directed to "publish in the Federal Register the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed." 19 U.S.C. § 1675(a)(1). As to the timing of the review, under 19 U.S.C. § 1675(a)(3)(A), Commerce

> shall make a preliminary determination . . . within 245 days after the last day
> of the month in which occurs the anniversary of the date of publication of the

> order . . . , and a final determination . . . within 120 days after the date on
> which the preliminary determination is published.  If it is not practicable to
> complete the review within the foregoing time, the administering authority . . .
> may extend that 120-day period to 180 days.  The administering authority may
> extend the time for making a final determination without extending the time
> for making a preliminary determination, if such final determination is made
> not later than 300 days after the date on which the preliminary determination
> is published.

According to plaintiffs, this statutory framework translates into Commerce's "clear duty to determine an estimated duty to be deposited within the statutorily proscribed timeframe." Pls.' Pet. 9.  In other words, plaintiffs believe that "Commerce has a non-discretionary statutory duty to determine the 'estimated duty to be deposited' upon completion of the administrative review.  And, by not timely completing that administrative review, Commerce failed to fulfill this statutory duty to Plaintiffs."  Pls.' Reply to Def.'s Opp. to Pet. for Writ of Mandamus 3 (ECF Dkt. No. 21) ("Pl.'s Reply").

Moreover, plaintiffs believe that this "clear duty" is further illustrated by Commerce's past performance.  "Indeed, by Commerce's consistent and well-established timely completion of preliminary results and final results in investigations, administrative reviews, and sunset reviews, . . . Commerce itself appears to have construed Congress' statutory timeline as mandatory."  Pls.' Reply 3.

Defendant responds that "Commerce has no clear, non-discretionary duty to issue a provisional cash deposit rate for Husqvarna's entries of subject merchandise."  Def.'s Resp. in Opp. to Pet. for Writ of Mandamus 2 (ECF Dkt. No. 20) ("Def.'s Resp.").  While "Husqvarna contends that on June 4, 2012, it was statutorily entitled to the 'timely completion' of the administrative review and an 'estimated duty deposit rate' . . . , the time limits set forth in section 1675(a) are directory and not mandatory."  Def.'s Resp. 8 (quoting Pls.' Pet. 10).

To support this assertion, defendant relies on Federal Circuit precedent holding that "when Congress intends there to be consequences for noncompliance with statutory deadlines for government action, it says so expressly."[6]  *Hitachi Home Elecs. (Am.), Inc. v. United States*, 661 F.3d 1343, 1347 (Fed. Cir. 2011).  In *Hitachi*, the Court determined that, because Congress had not expressly imposed any consequences for Customs' failure to act within two years,[7] the two-year deadline in the statute at issue was directory, not mandatory.  *Hitachi*, 661 F.3d at 1347.  In doing so, the Court relied on Supreme Court decisions for the proposition that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."  *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993); *see also Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1365 (Fed. Cir. 2010) ("[A]bsence of a consequence [in the statute] indicates . . . that [the relevant subsection] is a directory provision and not 'mandatory.'").

---

[6]      An example of a statute that expressly includes "consequences for noncompliance with statutory deadlines for government action," is the Speedy Trial Act.  18 U.S.C. § 3162(a)(2) (2006).  That statute reads, "[i]f a defendant is not brought to trial within the time limit required . . . the information or indictment shall be dismissed on motion of the defendant."  *Id.*  In *Zedner*, the Supreme Court confirmed that "[t]he sanction for a violation of the [Speedy Trial] Act is dismissal."  *Zedner v. United States*, 547 U.S. 489, 509 (2006).

[7]      In *Hitachi*, plaintiff argued "that its protest was allowed by operation of law when Customs failed to allow or deny it within the statutory time limit of two years [because] 'the plain meaning of the statute is that any protest not expressly denied by Customs within two years is allowed by Customs.'"  *Hitachi*, 661 F.3d at 1347–48 (citation omitted).  Under 19 U.S.C. § 1515(a), the statute at issue in *Hitachi*, "[u]nless a request for an accelerated disposition of a protest is filed . . . the appropriate customs officer, within two years from the date a protest was filed in accordance with section 1514 of this title, shall review the protest and shall allow or deny such protest in whole or in part."  Hitachi urged that "the use of the phrase 'shall allow or deny' in § 1515(a) means that in the absence of any express denial, a protest is automatically allowed after two years have passed."  *Hitachi*, 661 F.3d at 1348.  The Federal Circuit concluded, however, that "[n]othing in the language of § 1515(a) supports Hitachi's position.  While the statute contains the word 'shall,' . . . this is not enough to impose a specific penalty for noncompliance.  There is no statement of any consequence in the event that Customs does not act."  *Id.*

Here, the defendant insists that 19 U.S.C. § 1675(a)(3)(A) "does not contain any provision attaching consequences if Commerce fails to issue the final results within these timeframes.  Because Congress imposed no consequence for Commerce's failure to issue its final results within the timelines set forth in section 1675, the timeframe is directory, not mandatory." Def.'s Resp. 9 (citing *Norman G. Jensen, Inc. v. United States*, 687 F.3d 1325, 1330 (Fed. Cir. 2012) ("The clear import of our determination that Congress did not expressly impose any consequence for Customs' failure to [allow or deny a protest] within two years is that the two-year requirement is directory, not mandatory.")).  Therefore, defendant concludes, "Husqvarna's contention that it was statutorily entitled to a new cash deposit rate on June 4, 2012 is without basis."  Def.'s Resp. 9–10.

The court finds that plaintiffs have not identified a clear duty on the part of defendant to issue the final results within the time period set out by the statute.  While plaintiffs may be able to point to some general duty on the part of the Department to issue the final results within a set period of time, in order for the writ to issue that duty must be "clear."  Here, because no consequence is specified for noncompliance with the timing set forth in the statute, Commerce is under no clear duty to issue the final results within the statutory timeframe.

This holding conforms to the overwhelming weight of authority.  First, several Federal Circuit cases indicate that the deadlines found in 19 U.S.C. § 1675(a)(3)(A) are directory, not mandatory.  *See, e.g.*, *Jensen*, 687 F.3d at 1330 ("The clear import of our determination [in *Hitachi*] that Congress did not expressly impose any consequence for Customs' failure to act within two years is that the two-year requirement is directory, not mandatory."); *Hitachi*, 661 F.3d at 1347 ("[W]hen Congress intends there to be consequences for noncompliance with statutory deadlines for government action, it says so expressly."); *Liesegang v. Sec'y of Veterans*

*Affairs*, 312 F.3d 1368, 1377 (Fed. Cir. 2002) ("In the absence of any consequences for

noncompliance, . . . timing provisions are at best precatory rather than mandatory."); *Kemira*

*Fibres Oy v. United States*, 61 F.3d 866, 871 (Fed. Cir. 1995) ("[E]ven in the face of a statutory

timing directive, when a statute does not specify the consequences of non-compliance, courts

should not assume that Congress intended that the agency lose its power to act.").

      Second, the United States Supreme Court and other circuits are in accord with this view.

*See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 161 (2003) ("[A] statute directing official

action needs more than a mandatory 'shall' before the grant of power can sensibly be read to

expire when the job is supposed to be done."); *Sw. Penn. Growth Alliance v. Browner*, 121 F.3d

106, 113–15 (3d Cir. 1997) (holding that a statute stating that an agency "shall" act by a certain

deadline does not divest that agency's ability to act unless there is some additional indication in

the statute of a congressional intent to bar further action); *In re Siggers*, 132 F.3d 333, 336 (6th

Cir. 1997) ("The law is well established in this and other jurisdictions that '[a] statutory time

period is not mandatory unless it *both* expressly requires an agency or public official to act

within a particular time period *and* specifies a consequence for failure to comply with the

provision.'" (citations omitted)); *Hendrickson v. FDIC*, 113 F.3d 98, 101 (7th Cir. 1997)

("Standing alone, moreover, use of the word 'shall' in connection with a statutory timing

requirement has not been sufficient to overcome the presumption that such a deadline implies no

sanction for an agency's failure to heed it.").

      Thus, because there are no consequences established for Commerce's failure to act within

the timeframe set forth in 19 U.S.C. § 1675(a)(3)(A), plaintiffs have not demonstrated that

Commerce had a clear duty to issue the final results within the timeframe set out by the statute.

## II.   Plaintiffs Did Not Possess a "Clear Right" to the Relief Sought & Have an Adequate Alternative Remedy

### A.  *Provisional Cash Deposit Rate*

By their petition, plaintiffs ask the court to direct Commerce to assign Hebei Husqvarna a "provisional cash deposit rate" pending the issuance of the Department's final determination. According to plaintiffs, because there is no question that they will not be found to be subject to PRC governmental control, their rate would necessarily be lower than the 164.09% PRC-wide cash deposit rate to which Hebei Husqvarna is now subject.

Plaintiffs argue that Hebei Husqvarna has "a clear right to demand the relief sought, the publication of a provisional cash deposit amount." Pls.' Pet. 13.  Looking to the statute, plaintiffs urge that "Hebei Husqvarna is entitled to a new cash deposit rate *upon timely completion of the administrative review*. . . . [E]ven though in its preliminary results Commerce assigned Hebei Husqvarna a separate rate cash deposit duty amount of 8.50 percent *ad valorem*, . . . Hebei Husqvarna is required to continue to post 164.[09] percent *ad valorem* deposits long after the statutory timeline for publishing the results of the review has expired." Pls.' Pet. 12 (emphasis added).  For this reason, "[r]equiring Hebei Husqvarna to continue to post estimated duty deposits at the punitive [PRC]-wide rate . . . prejudices the interests of Hebei Husqvarna," and is especially egregious in light of the fact that "Hebei Husqvarna . . . had nothing to do with the circumstances which Commerce cites as the reason for exceeding its statutorily required timeline for completion of the administrative review." Pls.' Pet. 10–11.  Therefore, plaintiffs conclude,

> Hebei Husqvarna's right to a new cash deposit rate is squarely grounded in the statute and with the international obligations of the United States.  The request for administrative review was proper, and when Hebei Husqvarna was not selected as a mandatory respondent, Hebei Husqvarna relied upon the statutory timeframe to make business decisions regarding imports from China.  Such reliance was wholly

appropriate where Commerce has a recent past practice of timely completing administrative reviews.

Pls.' Pet. 13.

In addition, plaintiffs argue that the assignment of a provisional cash deposit rate for Hebei Husqvarna would not interfere with Commerce's ability to act, i.e., to complete its administrative review, nor would the provisional cash deposit rate affect the final assessment rates. Thus, plaintiffs claim that "[t]he issuance of such a cash deposit rate would be fair, in accordance with statute, and would not interfere with the ability of Commerce to calculate the most accurate dumping margin possible after considering all available evidence for entries made during the [POR]." Pls.' Pet. 10. In other words, according to plaintiffs, "the operation of the statutory deadline here would never deprive Commerce of taking any action it deems necessary to resolve the fraud issues." Pls.' Reply 4–5. For this reason, "Commerce's stated reasoning for the abrogation of its statutory duty to Plaintiffs is unreasonable because it maintains in place a punitive cash deposit rate when less sweeping alternatives were available to the agency." Pls.' Reply 4–5.

Next, plaintiffs observe that "Commerce may have deferred its final results because it believes that the assessment rate it ultimately assigns to the separate rate respondents will be impacted by whether Weih[a]i engaged in fraud by transshipping subject merchandise. But, that is not a sufficient reason to defer assigning Hebei Husqvarna a new cash deposit rate." Pls.' Pet. 11. To support their claim that uncertainty with respect to Hebei Husqvarna's ultimate rate is an unsuitable reason for not assigning a provisional rate, plaintiffs provide an overview of the

different scenarios that might occur depending on the outcome of the fraud investigation.[8]  In so

doing, however, plaintiffs concede that "the result of Commerce's fraud investigation *may*

impact the ultimate rate determined for assessment."  Pls.' Pet. 6 n.12 (emphasis added).

Furthermore, plaintiffs state in their Petition that their cash deposit rate "will either be 21.43

percent . . . or something less" and request that the court issue a writ requiring Commerce to set a

cash deposit rate "of either 21.43 percent . . . or 8.50 percent."  Pls.' Pet. 11, 2.  In their proposed

order, however, plaintiffs request that the court order Commerce to "issue a new cash deposit

---

[8]       Plaintiffs provide the following description of these various possible scenarios, which, in fact, demonstrate the uncertainty surrounding what Hebei Husqvarna's rate will be in the final results:

> [T]he rate assessed for entries during the [POR] is different than the cash deposit posted on entries occurring after June 4, 2012. . . . [E]stablishing a new cash deposit rate for Hebei Husqvarna . . . will in no way impact that assessment rate.

> Should Commerce find that Weih[a]i was involved in the transshipment scheme, . . . Commerce will assign Weih[a]i an antidumping duty margin based upon adverse facts available.  Commerce must exclude a margin based upon adverse inferences from its calculation of the average rate for separate rate respondents which will be used for assessment purposes. Should the other mandatory respondent, ATM, continue to receive a *de minimis* antidumping duty margin, . . . Commerce will liquidate entries made by the separate rate respondents using a margin based upon "any reasonable method," which would be the rate most recently established for the separate rate respondents—or, 21.43 percent *ad valorem*.

> If, however, Commerce finds that Weih[a]i was not involved in any fraudulent scheme, Weih[a]i's calculated margin, 8.50 percent, *ad valorem*, would continue to be the basis for the separate rate respondents' margins—as it had in the preliminary results—for assessment purposes.  If Weih[a]i receives a different calculated rate, that calculated margin would be the basis for the separate rate respondents' margins for assessment purposes.  This assumes that ATM will continue to receive a *de minimis* margin.  If ATM receives a margin above *de minimis*, that margin would be averaged with that calculated for Weih[a]i, so long as Weih[a]i's margin is not based upon adverse inferences, and would be the basis for the separate rate respondents' assessment.

Pls.' Pet. 6–7 n.12.

rate for Hebei Husqvarna of 8.50 percent."  Proposed Order 1 (ECF Dkt. No. 8).  As defendant

points out, the "inconsistencies in these requests demonstrate that even if there were a duty to

publish a new estimated deposit rate, nothing would compel Commerce to choose any particular

estimate."  Def.'s Resp. 14.  Put another way, plaintiffs' arguments concerning their "clear right"

to a provisional cash deposit rate are undermined by the fact that it is entirely unclear, even to

plaintiffs, what that rate should be.  Notably, plaintiffs cite no law authorizing Commerce to

issue a provisional rate, nor do they point to any statutorily-authorized procedure as to how the

rate would be determined.

Defendant's arguments are more persuasive.  First, Commerce correctly points out that

the "final antidumping duty rate assigned to the separate rate companies (including Hebei

Company) will depend upon the final rate Commerce calculates for the mandatory respondents . .

. , which will not become final until Commerce issues its final results."  Def.'s Resp. 10.  This is

the case because "if for some reason, a useable rate cannot be determined from the margins

assigned to mandatory respondents, Commerce will have to determine an alternative

methodology for calculating the margin for the separate rate companies.  If Commerce makes a

final determination that Hebei Company is eligible for a separate rate, such a rate will be

determined in accordance with th[is] practice . . . , depending on the outcome of one or more of

those variables."  Def.'s Resp. 11 (citation omitted).  In other words, defendant has shown that

the determination of a separate rate for Hebei Husqvarna is entirely dependent upon the results of

the completed review.  This being the case, defendant is correct that the Department "cannot

issue cash deposit rates based on estimates that have no basis on the record."  Def.'s Resp. 12.

Next, defendant correctly asserts that "Husqvarna has failed to identify any statute or

regulation that purports to require that Commerce issue a provisional antidumping duty cash

deposit rate if Commerce does not issue the final results within the timeframes identified in 19 U.S.C. § 1675(a)."  Def.'s Resp. 13.  For Commerce, under the statutory provision for an administrative review, "the most Husqvarna can legitimately claim . . . is that it 'is entitled to a new cash deposit rate upon timely *completion* of the administrative review.'  Because Commerce has not yet issued the final results of its administrative review, however, the relief Husqvarna seeks is not suitable for a writ of *mandamus*."  Def.'s Resp. 13 (quoting Pls.' Pet. at 12).  In other words, for Commerce, plaintiffs' clear right under the statute is a right to have a rate determined in the final results.  Indeed, plaintiffs appear to concede as much in their papers before making the leap to the conclusion that the statute requires the setting of a provisional rate.  Pls.' Pet. 12 ("Hebei Husqvarna is entitled to a new cash deposit rate *upon timely completion of the administrative review*.") (emphasis added).

All of this being the case, plaintiffs have failed to establish that they have a clear and indisputable right to a provisional cash deposit rate.  Indeed, they have not even established that Commerce has the authority to issue such a provisional rate at all.  Pursuant to statute, Commerce is required to set rates at the end of a review.  19 U.S.C. § 1675(a)(1) (Upon completion of a review, Commerce "shall publish in the Federal Register the results of such review, together with notice of any duty to be assessed [and] estimated duty to be deposited.").  As defendant points out, the completion of the review is required for the setting of accurate rates, especially for separate rate respondents, because a large number of factors must be considered.  As noted, plaintiffs have failed to cite any authority entitling them to the issuance of a provisional rate, authorizing the issuance of a provisional rate, or providing a procedure for the determination of a provisional rate.  Their arguments, therefore, have failed to demonstrate that they have a clear and indisputable right to a provisional cash deposit rate.

### B.  *Plaintiffs' "Adequate Means to Attain Relief"*

Next, plaintiffs insist that "[n]o such alternative remedy exists in this case."  Pls.' Pet. 13.
For plaintiffs, "Hebei Husqvarna is solely seeking a new cash deposit rate.  The alternative
remedy is to delay announcement of the new deposit rate . . . for reasons that have nothing to do
with Hebei Husqvarna."  Pls.' Pet. 13.  Moreover, "[t]here is nothing in the statute, Commerce's
regulations, or court precedent which would prevent Commerce from setting a provisional cash
deposit rate during the interim period when it considers the allegations of fraud."  Pls.' Pet. 13.
Furthermore, plaintiffs argue, "[t]he prejudice to Hebei Husqvarna is substantial.  Even though
Hebei Husqvarna is entitled to a separate rate antidumping duty cash deposit rate, it is still
subject to the prohibitively high China-wide cash deposit rate."  Pls.' Pet. 14.

Despite Hebei Husqvarna's arguments to the contrary, the court agrees with defendant
that "because Customs will refund to Husqvarna any excess duty deposits, including interest,
upon completion of each applicable administrative review (or following any subsequent Court
challenges . . . ), Husqvarna will not suffer undue harm or be deprived of meaningful judicial
relief due to the continued suspension of liquidation of the entries."  Def.'s Resp. 14–15.  In
other words, "because liquidation of Husqvarna's entries [is] suspended, and any excess duty
deposits it is now making will be refunded with interest at liquidation of those entries, Husqvarna
possesses the adequate alternative remedy of awaiting for the antidumping duty procedures to be
completed."  Def.'s Resp. 15.  Thus, the court finds that the refund of any excess duties paid plus
interest upon liquidation provides plaintiffs with an alternative remedy under these facts.
Therefore, plaintiffs have an adequate means of attaining relief without resort to mandamus.

For these reasons, plaintiffs' petition also fails on the second requirement for the writ.

III.     **Mandamus Relief Is Not "Appropriate Under the Circumstances"**

Because the court has found that no clear duty is imposed by the statutory time limits,

and that plaintiffs have no clear and indisputable right to have the writ issue directing the

assignment of a provisional cash deposit rate, the final requirement only merits a word.  As to

this final requirement, plaintiffs insist that "[a] writ of mandamus provides an appropriate means

of granting relief to Plaintiffs" because it "would afford relief to Hebei Husqvarna . . . that [it]

lawfully should have, while permitting Commerce to take all appropriate steps to protect the

integrity of the antidumping procedure from fraud."  Pls.' Pet. 14–15.  Furthermore, their

"proposed remedy, *i.e.*, the establishment of an interim cash deposit rate in place until the yet-to-

be-issued final results are issued, maintains the *status quo* but removes the harm Commerce's

sweeping action causes Plaintiffs.  This is precisely the 'less drastic' remedy the Supreme Court

envisioned in *Brock*."  Pls.' Reply 9–10 (citing *Brock v. Pierce Cnty.*, 476 U.S. 253, 260 (1986)

("When, as here, there are less drastic remedies available for failure to meet a statutory deadline,

courts should not assume that Congress intended the agency to lose its power to act.")).

Again, the court is convinced by defendant's arguments.  As defendant points out, "based

upon the facts and circumstance of this case, Commerce does not have a clear statutory duty to

issue a new cash deposit rate until it issues its final results of the administrative review."  Def.'s

Resp. 16.  Furthermore, "*mandamus* is never appropriate when, as is the case here, the party

seeking *mandamus* is afforded an adequate alternative remedy.  In this case, . . . [s]uspension of

liquidation . . . is an adequate remedy, and appropriate under the facts and circumstance of this

case."  Def.'s Resp. 16.

"Mandamus is a drastic and extraordinary remedy."  *Mukand*, 502 F.3d at 1369.  The

court is sympathetic to plaintiffs' situation, and understands the fairness arguments that support

plaintiffs' position.  Plaintiffs, however, have not demonstrated that the issuance of the writ is

authorized by law.  As the Supreme Court has stated, "[w]e do not agree that we should, or can,

invent a remedy to satisfy some perceived need to coerce the courts and the Government into

complying with the statutory time limits."  *United States v. Montalvo-Murillo*, 495 U.S. 711, 721

(1990).  Therefore, plaintiffs do not meet the requirements that are "designed to ensure that the

writ will not be used as a substitute for the regular appeals process."  *Cheney*, 542 U.S. at 380–

81.

## **CONCLUSION**

For the foregoing reasons, plaintiffs' Petition for a Writ of Mandamus (ECF Dkt. No. 8)

is DENIED.

    /s/ Richard K. Eaton

Richard K. Eaton

Dated: December 6, 2012
      New York, New York